ZEIGLER et al. v. HOPKINS et al.

(District Court, E. D. Kentucky. December 3, 1918.)

1. MINES AND MINERALS ⟜79(6)—OIL LEASE—FORFEITURE FOR NONPAYMENT OF RENT.

An oil and gas lease on land in Kentucky *held* not forfeited for failure to promptly pay the stipulated rental on failure to drill a well within one year, where the letter containing it was undelivered and immediately on its return the money was deposited in bank, as the lease provided might be done.

2. MINES AND MINERALS ⟜81—OIL LEASES—CONFLICTING LEASES.

An oil and gas lease *held* valid as against a subsequent lease which, while executed when the first lessor was technically in default for nonpayment of rent, was obtained by misrepresentation by the second lessees, who had actual notice of the prior lease and of complainants' ownership thereof, and express notice of complainants' right and claim before entering upon the land.

In Equity. Suit by H. J. Zeigler and Lee Howell against James S. Hopkins, A. J. Hopkins, A. R. Putnam, and Emma Hamilton. Decree for complainants.

Decree reversed, —— C. C. A. ——, 259 Fed. 43.

Kelly Kash and Hunter M. Shumate, both of Irvine, Ky., Martin T. Kelly, of Lexington, Ky., and Worthington, Cochran & Browning, of Maysville, Ky., for plaintiffs.

Pendleton & Bush, of Winchester, Ky., and A. J. Hopkins, of Chicago, Ill., for defendants.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

COCHRAN, District Judge. [1, 2] This cause is before me on final hearing. It involves a contest between owners of two successive oil and gas leases, covering a tract of 50 acres of land, in Lee county, in this district, made by the defendant Emma Hamilton, the owner thereof. The first one was made March 2, 1916, to W. J. Gibson. He assigned it July 11, 1916, to W. V. Abney, and Abney assigned it July 14, 1916, to plaintiffs, who have ever since claimed it. The lease first grants to Gibson "all the oil and gas in and under" the land, and the land itself, "for the purpose of entering upon, operating thereon, and removing therefrom said oil and gas for the term of 10 years from date, and as much longer thereafter as oil and gas is found thereon." It then provides that the "grant or lease was made" on five terms. The first one is in these words:

"Lessee agrees to drill a well upon said premises within one year from this date, or thereafter pay to lessors rentals as hereinafter provided until a well is completed or the property granted hereby is conveyed to lessor."

The other four have no pertinency to the controversy here. The lease thereafter provides as follows:

"Second party agrees to complete a well on the premises within one year from the date thereof (unavoidable accidents and delaying excepted), unless the lessee thereafter pays a rental of 10 cents per acre payable in advance until a well is completed, which payments for delay in completing a well may be made direct to any one of the lessors or deposited to Emma Hamilton in the Lee County Deposit Bank, Beattyville, Ky., which payments shall fully and completely extend this lease from time to time until a well is completed, and lessors agree to accept said payment of rentals when made and to mail receipts for same to the lessee. And it is further agreed that the lessee may at any time remove all his property and reconvey the premises hereby granted, which conveyance said lessor agrees to accept, and thereupon this instrument shall become null and void, and the payments which shall have been made be held by the lessor as full stipulated damages for nonfulfillment of the foregoing contract."

The lease was not recorded before its assignment to plaintiffs, but on July 17, 1916, three days thereafter, it, with the assignment to Abney indorsed therein, and the assignment to plaintiffs, which was on a separate paper, were delivered to the clerk of the Lee county court and the state tax on each instrument was paid. Thereupon both documents were legally lodged for record. The assignment to plaintiffs was at once recorded. For some reason the lease itself with the assignment to Abney indorsed thereon, was not recorded until July 23, 1917, after this controversy arose. It is claimed that the lease was not recorded when lodged, because the fee for recording was not paid. But there is no indication that the fee for recording the assignment was paid then, and yet it was recorded. It is likely that it was not recorded at the same time the assignment was recorded from oversight. Payment of the recording fee was thereafter demanded, and it was not recorded until such fee was paid. Though not recorded until the date stated, when lodged for record it was placed in the box for unrecorded instruments on which the tax had been paid and properly indexed.

No well has ever been commenced on the land under this lease. On February 25, 1917, just shortly before the lapse of a year from its

making, and in anticipation of the expiration thereof, when the first quarterly rental was to become due, the plaintiffs, through their manager, Eli Howell, sent by mail to the lessor, the defendant Emma Hamilton, $1.35, a $1 bill and 25 cents in stamps, $1.25 to pay the rent-al about to come due, and 10 cents for postage. It was sent from Irvine, in the county of Estill, which adjoins Lee, where plaintiffs had their headquarters. The envelope was addressed to the lessor at Evelyn, her post office, which was about 10 or 15 miles distant from Irvine, and from which she lived a distance of 4 miles. Inclosed in it, in addition to the money and stamps, was a letter and receipt for the quarter's rent, to be signed and returned by her. The envelope, with its inclosures, was returned to plaintiffs in 10 or 15 days undelivered, and on March 12, 1917, they deposited to the lessor's credit in the Lee County Deposit Bank the sum of $1.25 to pay the quarter's rent, which they sent to the bank by mail. Since then the quarterly installments of rent have been deposited to her credit in that bank as they matured.

The other was made by the defendant Emma Hamilton to her co-defendants, three in number and partners, on March 7, 1917; i. e., between the expiration of a year from the making of the lease under which plaintiffs claim, to wit, March 2, 1917, and the making of the first deposit of the quarterly installment of rent to the lessor's credit in the Lee County Deposit Bank, to wit, March 12, 1918. When these lessees took the second lease, they had actual notice that their lessor had given a previous lease, though not of the fact that the plaintiffs had acquired it. The defendant Putnam, on their behalf, visited the lessor on the 3d or 4th of March, 1917, a day or so after the year ran out, and she informed him that she had theretofore given a lease. She could speak only from recollection about it, as she had misplaced the copy thereof which she had retained. She informed him that she thought that it was only for a year and that the year had run out. She was an illiterate woman, and when it was given it was read over to her by the officer who took her acknowledgment, and Abney, who obtained it for Gibson, said that, if a well was not driven within a year or the rental paid, the lease would be null and void. There is some uncertainty as to whether she informed him as to whom the lease had been given, but the evidence tends to show that she told him, or he otherwise ascertained, that it was given to Gibson. A disinterested witness, who was present, testified that she said that she had given it to Gibson. Besides Martin's wife, an adjoining landowner, had made a lease to Gibson at the same time, and defendant Putnam was aware, not only of the existence of this lease, but that it was made to Gibson. The lease was not executed at this first interview. Possibly the lessor would not have made a second lease in her then state of mind, and it is likely that the defendant Putnam would not have taken it with such information as he then had.

The defendant Putnam who had had experience in examining titles, and the defendant James S. Hopkins, who is a lawyer, went at once to the office of the clerk of the Lee county court, to see what they could find as to this prior lease given by the defendant Hamilton. They found nothing. They testify that they looked into the box containing

instruments lodged for record, but not recorded, and it was not there, and that they inquired of the clerk whether there was an index of such instruments, and he told them that there was not. The clerk denies both of these statements. Whilst I have no reason to doubt the veracity of these two defendants, I cannot accept these statements as true. The clerk had no interest to mislead them or testify falsely. The first lease is before me, indorsed lodged for record by the clerk at the same time, day and hour, that the assignment, which was at once recorded, is indorsed as so lodged, and it is unquestioned that there is in the clerk's office an index of instruments lodged for record but not recorded, and that this lease is properly indexed therein. The testimony of these two defendants is to be accounted for in this way: It is likely that there is in the Lee county court clerk's office, as in every other county court clerk's office in the state, a box or other receptacle containing instruments delivered to the clerk, on which the tax has not been paid, which are therefore not legally lodged for record, and of which no index is kept. If so, the clerk understood their inquiry to relate to such instruments, and it was into this box that they looked. To find an instrument on which the tax has been paid, and which is therefore legally lodged for record, it is not likely that the box containing such instruments will be looked into, unless the index of such instruments is first examined, and it is found to be indexed. These two defendants were strangers to Kentucky, and liable not to have made themselves understood. Either such was the case, or a more adverse view of their testimony will have to be taken.

It was after this examination of the records that the defendant Putnam again visited the lessor on March 7, 1917, and obtained the second lease. He stated to her that he had searched the clerk's office and the lease was not of record. It was on the basis of this statement that the second lease was made. At the same time Putnam obtained a lease for himself and partners from Martin and wife on the adjoining land, covered by the prior lease to Gibson from Martin's wife, and which plaintiff also held on the idea that such lease was invalid, in that Martin had not united in it. The defendant lessees placed their lease from the defendant Hamilton on record March 13, 1917. On April 18, 1917, before they had made an entry under this lease, they were actually notified by plaintiffs that they were the assignees of the Gibson lease, and claimed under it. Thereafter, and before this suit was brought, they entered and drilled three good wells. As soon as plaintiffs were informed that the defendant lessees were developing the property, they demanded that it should cease, and shortly thereafter brought this suit. Plaintiffs' general manager testified that he notified defendant Putnam of their lease, and warned him not to interfere, on or about February 25, 1917. This Putnam denies. As the two are of equal credibility, I prescind from this testimony.

It must be held that the equity of this case is with the plaintiffs. When the defendant lessees obtained their lease, they had actual notice that a prior lease had been given, and constructive notice that it had been assigned to plaintiffs, and, if it was still valid, that they were the holders thereof. The fact that the lease and the assignment thereof to

Abney had not been recorded did not prevent such being the case. It is sufficient that the tax had been paid and the lease lodged for record. Cain v. Gray, 146 Ky. 402, 142 S. W. 715.

Furthermore, it cannot be said that the defendants were not without fault in not finding that the lease had been assigned to plaintiffs, the finding of which should have led to an inquiry of them as to what they had done towards paying the rental that had just accrued, and which inquiry would have then developed whether the present claim as to what was done is true. The lease was lodged for record, was in the box containing such instruments which had not been recorded, and was properly indexed.

Still further, defendants obtained their lease upon a misrepresentation, if not made by so many words, made by action. The misrepresentation was not a willful one; i. e., it was not made with a knowledge that it was such. Yet it was none the less a misrepresentation. It consisted in the representation that the prior lease, under which plaintiffs claim, was invalid because not of record. This representation was not true, even if the lease had not been lodged for record. Recordation is not essential to the validity of a recordable instrument. If it amounted to no more than that it was not valid as to defendants, still it was not true. They had actual knowledge of its existence and constructive knowledge as to its being held by the plaintiffs. It was on the basis of this misrepresentation that the defendant Hamilton executed the lease to the lessee defendants. It is not unlikely that she would have made it on the ground that it had run out, had she been put to it to do so. But she did not in fact make it on that ground.

Yet again the lessee defendants were indifferent towards plaintiffs' right in the matter of the Martin lease. When they ascertained that there was a possible defect in that lease, in that Martin had not united with his wife in making it, without considering whether possibly plaintiffs had some equities in the matter which might lead Martin untempted to testify the defect, if there was one, and without saying a word to plaintiffs about it, they induced Martin and his wife to make a second lease to them. This treatment of plaintiffs is, so far as my experience goes, characteristic of the treatment by oil men of one another. If they think that they have found some defect in an existing lease sufficient to overthrow it, they do not reflect whether fair dealing requires that they should either hands off, or first take the matter up with the lessee therein, to find out exactly how it stands from his point of view, but tempt the lessor to make a second lease by offering a better bargain, and then, when the first lease is asserted against it, enlarge on the great wrong done the lessor, either by the terms of the first lease or what the lessee has failed to do thereunder.

And finally, before the defendant lessees had incurred any expense in developing the property under their lease, they had actual notice that plaintiffs were claiming the right to develop it under the first lease as assignees thereof. On the other hand, the plaintiffs and those under whom they claim are not open to serious criticism. It is urged that Gibson had no intention to develop the property, and that his sole purpose was to dispose of the lease for a consideration. This is usual

in such cases, and the lease contemplated that this might be done; for it expressly provided that the terms and conditions thereof should extend and apply to the assigns of the lease.

It is urged, further, that there was no development during the first year. But, as is usual in such cases, the lease expressly provided for the extension of the time of development by the payment of the stipulated rental. Outside of Kentucky the lease might be open to the criticism that the time of development could be extended for 10 years by payment of such rentals. But it is not open to such criticism in Kentucky, since the decision in the case of Monarch Oil, Gas & Coal Co. v. Richardson, 124 Ky. 602, 99 S. W. 668. There was a lease for 20 years, with an agreement to drill a well in a year or pay a certain annual rental until it was drilled. It was held that the lessee could not postpone the drilling of the well for 20 years by payment of the annual rental, but that the lessor could at any time require the well to be drilled within a year by giving notice to that effect. Whilst this may be said to remake the contract for the parties, it lays down a very equitable rule. In view of this, the lessor here could, by giving notice, require a well to be drilled, possibly in three months after the expiration of the first year.

Nor should plaintiffs' failure to pay the rent at the end of the first year, when it became due, bring them into disfavor. There can be no question that what they did did not amount to such payment. But their failure to make payment was a pure misadventure. The defendants question whether plaintiffs made the effort to make such payment which they set forth. They rely on several considerations as weakening the claim that they did:

One is that the returned letter is not produced. Plaintiffs account for its absence by saying that it has been lost. This is said, however, after the litigation has arisen and the importance of having it is appreciated. From the standpoint of its importance, it is hard to realize why it would not have been preserved. It must therefore in some way have got lost. But when it was received back the circumstances were not conducive to the thought that it was important to preserve it. No litigation was then on hand or anticipated, and promptly upon its return the deposit was made. It is possible that on its receipt the letter was opened and money and stamps removed, and then no pains taken to preserve the envelope or letter, a copy of the latter of which had been made and retained when it was mailed. Its absence, therefore, may be accounted for by the fact that no pains were taken to preserve it, and not on the ground that in some mysterious way it got lost.

Another is that plaintiffs in their original bill alleged that what was inclosed in the letter was a check for the rent, and plaintiffs' manager, who claims to have sent the rent, swore thereto. The manager placed the blame on the attorneys, and the attorneys accept it. But it is not improbable that the manager himself was to blame. He may have told the attorneys that he sent it by check, by a slip of the tongue, and by inattention not have observed the allegation in the bill. I notice that when he testified as a witness herein, and was asked what he did towards paying the rent before the year expired, his answer was:

"We mailed a check to Mrs. Hamilton." This he did, notwithstanding he then had in his hands the copy of the letter which he claimed to have mailed to the lessor, in which it was stated, and he thereafter testified, that he inclosed a $1 bill and 35 cents in stamps, as had theretofore been alleged in the amended bill.

A third consideration is the testimony of the postmaster at Evelyn that no such letter was received at his post office and returned. Several things weaken the value of this testimony. It may have been received and returned, and the postmaster have forgotten about it after a lapse of a year and a half. There may have been an assistant postmaster responsible for its nondelivery and return. There is usually an assistant postmaster at such post offices. No inquiry was made as to whether there was one here. Then it may have been sent to another post office by mistake of some official. I had this experience last spring. I mailed a letter, addressed to Lebanon, Ky., plainly, I thought. It was sent to Corbin, Ky., and after having remained there for a month or two it was returned to me. I thought possibly that plaintiffs may have misdirected the letter. Their lease did not give the lessor's address. The sole information which plaintiffs had was a map of that territory, and her land was closer to Arvel, another post office, than Evelyn. But this is negatived by the fact that the address given in the copy of the letter which was retained and in the deposit slip is Evelyn.

On the other hand, there are several considerations which require an acceptance without question of the correctness of plaintiffs' claim that an effort was made to make payment, and it was unsuccessful in the way for the reason claimed. One is the positive testimony of plaintiffs' manager to that effect. There is not the slightest reason to question his veracity. Another is the copy of the letter which is claimed to have been sent, which it was natural and businesslike to retain, bears the marks of genuineness. Another is the deposit in bank of the rent on March 12, 1917. This removes all possibility of claiming that plaintiffs had abandoned the lease until, by reason of the development of the property by the defendants, it was shown to be good oil territory. When this deposit was made, not only no such development had been made, but plaintiffs had no information that the defendant lessees had become interested in the property, or were likely to become so. And, finally, the change in position of plaintiffs as to what they inclosed in the letter to their lessor. This circumstance is not only not against the truthfulness of their claim that they made such effort to make payment, but decidedly strengthens it. It evidences that they are not setting up a false claim and trying to mislead. If such were the case, no such change would have been made. As good a case could have been made out to the effect that the effort was to make payment by check as by currency and stamps, and an opportunity would not have been afforded defendants to make a point of the change. I can say that I have had the slightest doubt as to the truthfulness of this claim.

Another criticism of plaintiffs' conduct, which has been advanced, is their failure to pay the recording fee of the clerk. I am not ad-

vised that the clerk had the right to demand payment of this fee before recording the lease. It is not likely that the failure to record it at once was due to this circumstance. The assignment was recorded at once, and there is no indication in the evidence that the fee for recording it was paid in advance. Nor is it certain that plaintiffs were derelict in not paying the fee for recording the lease after demand of payment was made. And at most this is not a 'matter of which defendants can complain. It is very likely that the second lease would have been made, had defendants been fully advised of all the circumstances. The defendant lessees would have taken the position that the plaintiffs' lease was forfeited by the failure to make payment of the rental before the expiration of the year, and offered the defendant lessor sufficient inducement to make the second lease.

And, finally, criticism is made of plaintiffs' use of the mail to make payment of the rental, instead of making payment to her in person. The mail was reasonably sure. If it had not been used, some other agency would have reasonably been resorted to. Had the deposit been made in the bank, she would have had to have been at the trouble and expense of going to Beattyville to get it, or it would still have had to have been sent to her by mail. The uncontradicted evidence is that it is customary to make such payments by mail, and the lease itself seems to contemplate that payments to the lessor direct might be made by mail, in that it provides that the lessor is to accept payment of the rentals and "to mail receipts for same to lessee."

It is in view of the facts of this case as thus presented that I conclude that the equity thereof is with plaintiffs. The only thing that can be said in favor of the defendant lessees is that they have developed the property and incurred considerable expense in so doing. But this they did after they had full notice of plaintiffs' claim, and in so doing they voluntarily took the risk of losing out. This equity in favor of plaintiffs is such as to require that, even if the failure to make payment in time of the installment of rent due on or before March 2, 1917, worked a forfeiture of plaintiffs' rights under their lease, they should be relieved against it. But I do not think it worked a forfeiture. I still adhere to the views advanced in the former opinion herein, with a possible qualification. The rule laid down in Monarch Oil & Gas Co. v. Richardson is an equitable one. It finds no warrant in the contract of the parties. Indeed, it may be said to work a change therein. The parties agreed in the lease involved therein that the lease should have the right to explore for 20 years. The lessee agreed to drill a well within a year or to pay a certain annual rental until the well was drilled. According to the contract of the parties, therefore, the lessee, by paying the rental, could postpone development as long as he desired. What, then, are the implications of this decision? Are the rights of the lessee subject to what is equitable in other particulars? If, so, there is room to hold that if the lessee should refuse on demand, or even if he should intentionally fail to pay rent when it becomes due, that he forfeits his rights. I am not prepared to commit myself as to this, and it is not necessary that I determine it in this case. The defendant Hamilton did not demand payment of the rent which be-

came due March 2, 1917, and the plaintiffs did not intentionally fail to pay it. Their failure to pay was wholly unintentional, and, as I have held, the result of a pure misadventure. The case of Monarch Oil, Gas & Coal Co. v. Richardson requires, further, that there should be no forfeiture where the failure to pay was unintentional and the result of such a misadventure. The plaintiffs are entitled to the decree.